Engles *v.* Marshall.

## ENGLES *v.* MARSHALL *et al.*

The principle decided in *Stevens* v. *Irwin* (15 Cal. 506) that, to make a sale of personal property good against creditors of the vendor, the vendee must take *actual* possession; that the possession must be open and unequivocal, having the usual indications of ownership by the vendee so as to notify the world of his claims, and that this possession must be continuous, etc., affirmed.

The Court below did not err, in instructing the jury that the facts showed no valid sale for want of such change of possession of the property as the Statute of Frauds requires.

Appeal from the Sixth District.

Action to recover the value of certain horses, harness and a stage coach alleged to have been illegally taken from plaintiff by defendants. The defense was a seizure on the twentieth of December, 1860, and subsequent sale of the property by defendant Marshall, as Sheriff, on attachment and execution in the suits of defendant Ebner and one Milburn against George Engles & Co., a firm composed of George Engles and Wm. Hamilton.

On the trial, plaintiff offered in evidence a bill of sale from George Engles to Wm. Engles, executed Sept. 26th, 1860, of all the right, title and interest of the vendor in and to " thirteen head of horses now running on the Citizens line of Stages between Sacramento and Marysville, and being now driven by John White; also one black coach and three sets of four horse harness, used on and with the same; also one-half of the feed now lying at the twelve mile house on the said road." The consideration in the bill of sale was $2,900, which was credited on a note for $2,000, with interest at two per cent. per month, dated January 16th, 1858, made by George Engles to order of Wm. Engles—there being considerable interest due on the note.

Wm. Hamilton, a witness for plaintiff, then testified as follows: " The property in question was used in the Citizens Stage Line between Sacramento and Marysville; and I had full charge of the whole business. Wm. Engles authorized me to take charge of it for him. He put the property in my charge on the twenty-sixth or twenty-fifth of September, 1860, and I kept the horses until they were taken off the road, December 15th or 16th of that year.

George Engles had nothing to do with the property since the sale ;
I hired the men and paid for them.   The property I speak of is
the same as in the complaint.   There was one team of four horses
at the twelve mile house, one at Bear river, and one on the road.
After the sale, the name of the firm was changed to Wm. T.
Engles & Co. ; the ' T ' is a mistake, but the firm name was so put
in the way-bills.   I ordered the agent in Marysville to change the
advertisement in the Marysville papers.   There was an advertise-
ment of the old firm in the *Daily Bee* in Sacramento city.   I did
not order the advertisement changed, nor was it changed.   Before
the sale, George had tended to all the business here and on the
road ; he paid the bills, and he bought the feed.   After the sale, I
tended to it alone.   I brought the stock in from the road to Hutch-
ins' stable ; we take it off every year when the road gets muddy.
The property was attached at ten o'clock at night ; the same that
I brought them in.   The property had been in my possession as
agent of Wm. Engles from Sept. 26th until that day.   I bought
the feed for the horses and paid the bills.   White was driving for
me."

Cross examined : " White commenced to drive Sept. 1st, and con-
tinued to do so until the stock was taken from the road.   I buy
feed of Knox & Requa ; don't know the feed was bought before
the sale ; I told them to make out the bill to Wm. Engles & Co.
I got the horses shod at the same places where they were shod be-
fore the sale ; I told them to make out the bill to Wm. Engles &
Co., but I told the blacksmith about the change.   The horses were
kept at the same stable on the same stations as before the sale.
The stage office here is at Ebner's hotel.   George Engles was not
generally there when the stages came in ; he never examined the
books after the sale to William.   The way-bills after the sale were
headed Wm. Engles & Co.   Huff was my agent here, and Harmon
on the other end of the line.

" I know Mrs. Milburn ; Huff is her agent, I think.   I do not
know that George Engles owed her, but George Engles told me to
tell Huff that he, George, would pay her.   I did not conceal from
Huff that the property was sold ; Huff knew the property was sold
to plaintiff.   There were but two stations between here and Marys-

ville—one at the twelve mile house, and the other on Bear river. Manny and two men brought the stock from the road; arriving in town, we put our stock separate—my stock on one side, and Wm. Engles' on the other.   I think they were attached the same night. On Christmas I let George have a team to go to a ball at Sutterville.    Wm. Engles had sold one horse out of the team, so I loaned him one of mine to make it full.   Wm. Engles stays generally in Stockton, but was here on the twenty-sixth day of Sept. and stayed some days.   I owned half the stock in the stage line, and Wm. Engles the other half, separately, but we divided the expense and profits in running it between us; I attended to his part for him. I told Hough that George Engles told me to tell him, that as soon as the stock was taken off the road, he would either pay Mrs. Milburn's note, or turn her out in payment this same stock.   I was afraid the stock would be attached by her, as I was afraid it would stop the line.   After Sept. 26th, Wm. Engles stayed here two or three days; most of the time since he has been at Stockton."

Direct: "The coach was worth three hundred dollars, the two sets of harness, fifty dollars; two gray horses, two hundred and ten dollars; one white horse, one hundred and twenty-five dollars; two bay horses, two hundred and fifty dollars; one pinto, sixty dollars; one dun horse, one hundred and fifteen dollars; one chesnut sorrel, one hundred and twenty-five dollars.   There was no concealment about the change in the ownership; it was talked about in Ebner's hotel.   I ordered the bills to be made out in the name of Wm. T. Engles.   Huff, the agent here, knew all about the sale; what I told Huff on request of George Engles, William did not authorize me to say; he knew nothing about it.   The hostlers took care of my stock, as well as that of Engles.   I notified the hostlers at every place of the change of proprietorship.   I don't know who drove the team to Sutterville, or who went.   George asked me for the loan of a team, and I let him have it.   In my conversation with Huff, I had no authority from Wm. Engles to treat with him, and Huff knew all the time of the sale; he knew of it on the twenty-sixth of September.   After the twenty-sixth of September the bills at Ebner's were made out to Wm. T. Engles & Co.   I ordered a change of advertisement in Marysville, but forgot to do so here; the advertisement here was only Engles & Co."

Cross examined : " I don't know what the property brought at Sheriff's sale.   I did not make any representations to Huff to induce him to forbear attaching.   George Engles told me to speak to Huff.   George Engles drove the stage until he got lame, and then employed White."

White sworn : " I drove for George Engles from the first of September ; he was quite lame.   On the twenty-sixth day of September, George and Wm. Engles drove up to the twelve mile house ; George then and there, in my presence, delivered to William nine horses, and the coach and harness, and told me that we had to part. Wm. Engles then asked me to continue on as before, that he would pay me the same wages as before the sale.   I drove for George Engles and drew my wages from Huff.   After the sale I drove for William Engles, and Hamilton paid me money whenever I wished some.   Wm. Engles paid the balance due me when the horses were taken off the road.   George Engles had nothing to do with the property since the sale.   I heard Wm. Hamilton testify as to the value of the property ; his estimate is very low. 'This is my receipt ; it is dated Dec. 21st ; I was paid the amount by William Engles before the stock was attached."

Cross examined : " Huff employed me Sept. 1st on behalf of Geo. Engles, who was lame ; George never paid me any money. At the delivery, the horses were led out, and George said to Wm. ' Here is your property.'   William Engles then told the hostler to take care of the property for him, that he would pay him.   This was on the twenty-sixth or twenty-seventh of September last."

I. Laman sworn : " I am the proprietor of the twelve mile house ; was present at the delivery of the property in question there.   I went to the barn at the request of George Engles, and George then said to his brother William : ' There are four horses, and there are the other four, and the harness and the coach ;' he pointed at the ninth horse, saying, ' There he is, that is the property ;' he wanted me to notice it.   Some months after, Hamilton asked me to make out the bill ; on presentation, Hamilton objected that up to Sept. 26th, the bills have been made out for George, and after that time for Wm. Engles & Co.   The horses are in the charge of hostlers employed by the stage owners.   Wm. Engles told the host-

ler he would pay him after that; George told me he had sold out to Wm. Engles; George had nothing to do with the property after delivery."

Cross examined: " This was in September; do not know the exact time. George told me to notice the sale. My bills after that were made to Wm. Engles & Co.; Hamilton said that William had to pay his share in them."

Manny sworn: " I live on Bear river. About the twenty-sixth of September, George and Wm. Engles came to the barn with me; George said he was going to leave me; he had sold out to his brother William; William agreed to pay me after that. Hamilton settled with me afterwards for Wm. Engles & Co. George delivered four horses and their harness to William; since that day I have never seen George."

Cross examined: " George wanted me to notice and witness the delivery."

George Engles, having stated on his *voir dire* that he had no interest in the event of this suit, was sworn and said: [Note shown to witness] " That is my note; it is a just indebtedness; it was executed by me early in 1858 for cash lent me by my brother; on the twenty-sixth of September I sold him all the interest I had in the coach and horses. [Bill of sale shown.] That is the bill of sale I executed. I delivered him four horses first, then the other four and the coach; I pointed them out to him at the twelve mile house. Nine horses and one coach were delivered on Bear river; I delivered the other four. William told the hostlers he would pay them. After the twenty-sixth of September I had nothing to do with the business or property; before that I managed the business, bought hay and grain, and drove the stage until I got sick, Sept. 1st; I heard Hamilton's testimony as to the value of the horses; he estimated them from ten to fifteen dollars each too low, except only the pinto horse. Eight horses of my brother's were levied on by the Sheriff."

Cross examined: " The money was lent me in 1856 and 1857 by my brother to set me up in the stage business, but the note was executed in 1858, when I settled with him at his house in Stockton. I sold him a coach, two sets harness and thirteen horses; the coach

and harness is the same as levied upon, and the eight horses are part of the thirteen.   The coach and horses are actually worth $2,500, but I tried to get the most I could paid off on the note. There was no understanding between me and my brother that I should have the property back.   I sold the stock to my brother as he would be more likely to assist me afterwards, but there was no agreement between us.   I did not request Huff not to tell Mrs. Milburn of the sale ; on the contrary, I told him to inform her.   I did tell Huff that I would pay the note to Mrs. Milburn, or induce my brother to let her have part of the stock.   I was present when the bill of sale was made ; the note was there also.   My brother, I believe, employed Mr. Crocker ; I did not employ him.   I saw Martin in San Francisco before I went to the Notary where his deposition was taken ; I was present at the taking of the deposition in San Francisco."

Direct : " Huff told me he did not like to tell the woman. I had no arrangement with or authority from my brother that I should get some horses back to pay her.   I was bound to pay my brother first, as he started me in the business.   The indebtedness existed long before the sale."

This was all the evidence for plaintiff.

Defendant then introduced the papers in the attachment suits of *Ebner and Milburn* v. *George Engles,* together with the execution, return, etc.

Huff, sworn for defendant, said : " I am agent for the Citizens Stage Line.   Engles and Hamilton commenced in winter of 1859 ; they owned separate stock in the road.   John White was employed by me in September on behalf of George Engles ; he continued to drive until the stock was taken off the road.   In September, Wm. Engles came to me and said he had bought his brother's interest, and wanted the way-bills changed to Wm. T. Engles & Co.   I asked Hamilton about it, and he said it was all right.   Wm. Engles said he would pay me.   The next day he left for Stockton, and did not return until December.   All that time George Engles was in town ; was rarely in the office.   He sometimes drove to the boat, or to the International ; did what he could do ; he was sick.   One day in November, after I heard of the transfer, Capt. Taylor came

up and forbid George to drive a stage to the boat in a —— manner, and George answered their stages had not done so before, nor were they likely to do so again."

Plaintiff objected to the last sentence, on the ground that the admissions of vendor after sale are incompetent. Overruled and exceptions. "No change was made in the brand of the horses, or the mark of the coach. I have been in the stage business several years; know the property sold and its value. It sold for eight hundred and fifty-four dollars, all it was worth. The coach is worth two hundred and sixty-five dollars, sold for that; harness, sixteen dollars and a half, sold for that; one horse sold for ninety-five dollars, its value; another for eighty-five dollars, its value; another for one hundred and twenty-five dollars, its value; two horses were worth two hundred and fifty dollars; two others, two hundred dollars; one pinto horse was worth and sold for forty dollars."

Cross examined: "I was acting as agent to Milburn in regard to the debt owing her by George Engles at the time of sale. William told me he would see me paid for acting as agent. Wm. did not tell me to change the way-bills; I asked him about it at Ebner's hotel; he did not tell me he had taken possession of the property when he told me to continue on for him. It was about the time of the sale. He told me to keep on as before, and he would pay me. It is customary to take the stock off the road in winter, as the stages do not run. He told me to strike out George in the way-bills and insert William T., and to look to him for pay. I do not know whose coach George drove to the boat; Hamilton may have asked him to do so; it was very common for one driver standing round to drive the coach a small distance, and to the boat for another."

Deposition of Martin was next read: in substance, that he was about Ebner's hotel from Oct. 1st to Dec. 1st; that Hamilton was there managing the stage line; that he, witness, heard and understood that George Engles had sold out; that George was around the hotel looking about, and that White and Hamilton drove.

Schaefer sworn: "I am barkeeper at Ebner's Hotel; know George Engles. In August and September last George was in town sick. Hamilton and George Engles were proprietors of the

Citizens Line of Stages; they stop at Ebner's Hotel. After the sale I saw George around sometimes; saw him on the coach twice I think."

Cross examined: "I did not see George drive. He did not do any thing at the office. Wm. Engles did not tell me to charge him; he did not know, I suppose, there was an account at Ebner's. I never saw George drive; he was sitting on the coach."

E. Kraus sworn: "I live near Ebner's Hotel; know George Engles. I have not seen George drive a coach since September."

Cunningham sworn: "I know the coach, and three horses of the eight. I drove them to Sutterville about Christmas; they were not then attached. George Engles asked me to drive him down; he and Duffie paid me."

D. Reicker sworn: "I know the Citizens Stage Line. I kept their stock in Marysville; know Wm. Engles; got acquainted with him three or four months ago; George Engles first employed me to keep them. In September I was notified that he had sold the horses; George and Hamilton informed me that George had sold out. There was a change made in the charging in the books at Marysville; I was paid by Wm. Hamilton every month."

Putnam sworn: "I am Deputy Sheriff. The property brought all it was worth—about $1,004."

This was all the evidence for defendant.

Plaintiff in rebuttal called Hamilton, who said: "The coach George drove, of which Huff speaks, was my coach, and he did so at my request. I was present at the conversation with Captain Taylor. George did not claim the coach as his own."

Cross examined: "I don't exactly know what George did say."

This was all the testimony in the case.

The Court instructed the Jury as follows:

"In this case the evidence shows that there was no immediate delivery of the property, and that there was no actual and continued change of the property under the sale from George Engles to the plaintiff. You will, therefore, find a verdict for the defendants." To which charge plaintiff excepted. Verdict and judgment for defendants.

The entire evidence has been given: 1st, because a full state-

ment of the evidence is at least proper for an understanding of the opinion as to delivery of personal property, etc. ; 2d, because the case is an example of that class of cases where the Court below has power to pass on the effect of the evidence, take the case from the jury, and direct a particular verdict.

Plaintiff appeals.

*E. B. Crocker*, for Appellant.

I. The Court erred in refusing to submit the question as to the delivery and change of possession to the jury. (*Blenkensop* v. *Clayton*, 7 Taunt. 599 ; *Edam* v. *Durfield*, 1 Adolp. & Ellis. N. S. 307 ; 41 E. C. L. R. 553 ; *Chaplin* v. *Rogers*, 1 East. 192 ; *Phillips* v. *Bistolli*, 2 Barn. & Cress. 511 ; 9 E. C. L. 225 ; *Lillywhite* v. *Devereux*, 15 Mees. & Wels. 283 ; 17 Ala. 602 ; 26 Vt. 659 ; 1 Watts, 278 ; 16 Ill. 513 ; 6 Barr, 239 ; 26 Maine, 18 ; 9 Ala. 937 ; 9 Texas, 598 ; 19 Miss. 84 ; 16 Id. 114.) The Court, in charging that there was no evidence of an actual and immediate delivery, invaded the province of the jury. (*Pacheco* v. *Hunsacker*, 14 Cal. 124 ; *Samuels* v. *Gorham*, 5 Id. 226.) All questions compounded of law and fact must be submitted to the jury. (*Foot* v. *Wiswall*, 14 Johns. 304.)

II. The evidence showed a delivery and change of possession, in compliance with the statute.

As to what constitutes a delivery of personal property, depends upon the nature of the property, and when the thing does not admit of an actual delivery, a symbolical delivery is sufficient ; as a delivery of the key of a warehouse is a delivery of the goods in it. The consent of the party on the spot is a good delivery of ponderous bodies, and the possession may be taken by the eyes and the declared intention. (2 Kent's Com. 646–650 ; *Chaffin* v. *Doub*, 14 Cal. 386 ; *Pacheco* v. *Hunsacker*, Id. 129 ; *Stevens* v. *Irwin*, 15 Id. 503 ; *Cartwright* v. *Phoenix*, 7 Id. 281 ; *Samuels* v. *Gorham*, 5 Id. 226 ; *Montgomery* v. *Hunt*, Id. 366 ; *Walling* v. *Miller*, 15 Id. 40.)

*Frank Hereford*, for Respondent.

The instruction of the Court was right, because there was no

Engles *v.* Marshall.

evidence tending to show a delivery and continued change of possession according to the statute.  (*Hubbard* v. *Bogardus*, 10 Cal. 518.)

BALDWIN, J. delivered the opinion of the Court—FIELD, C. J. concurring.

Upon examining the record in this case, we think the Judge below did not err in instructing the jury that the facts showed no valid sale, for want of such change of possession of the property in controversy as is required by the Statute of Frauds.  The property seems to have remained, to all external appearances, in the same condition in which it was before the sale, with nothing to notify third persons of the sale, or of the claims of the new owner.  In *Stevens* v. *Irwin* (15 Cal. 506) we said : " Delivery must be made of the property ; the vendee must take the *actual* possession ; that possession must be open and unequivocal, carrying with it the usual marks and indications of ownership by the vendee.  It must be such as to give evidence to the world of the claims of the new owner.  He must, in other words, be in the usual relation to the property which owners of goods occupy to their property.  This possession must be continuous—not taken to be surrendered back again—not formal, but substantial.  But it need not necessarily continue indefinitely, when it is *bona fide* and openly taken, and it is kept for such a length of time as to give general advertisement of the *status* of the property and the claim to it by the vendee." An application of these principles to the evidence shows that the case of the plaintiff is within the Statute of Frauds.

Judgment affirmed.