[No. 746.]

## B. T. GRAY ET AL., RESPONDENTS, *v.* J. D. SULLIVAN ET AL., APPELLANTS.

SALE OF PERSONAL PROPERTY—ACTUAL AND CONTINUED CHANGE OF POSSESSION—STATUTE OF FRAUDS.—Where personal property is purchased for a fair consideration: *Held,* that in order to take the case out of the operation of the Statute of Frauds, the vendee must take actual possession of the property, the possession must be open, unequivocal, substantial and continuous, and must not be taken to be surrendered back.

IDEM.—When it appears from all the facts and circumstances, considered in the order and manner in which they occurred, after the purchase, that the vendee exercised such acts of ownership as is usual for persons who own the same species of property, and that the property was at all times after the purchase under his direction and control, and was in his charge at the time of the levy, and had not been in the possession of either of the vendors: *Held,* that this brings the case within the rule above announced.

IDEM—EMPLOYMENT OF SERVANT OF VENDOR.—As it is well settled that the employment of the vendor in a subordinate capacity is only colorable and not conclusive evidence of fraud: *Held*, that no stronger rule ought to be adopted against the employment of the mere servant of the vendor.

APPEAL from the District Court of the Sixth Judicial District, Eureka County.

This action was brought by respondents to recover from appellants certain personal property mentioned in the opinion.

The evidence shows that respondents paid fifteen hundred dollars for the property. The answer of appellants denies that the property is of any greater value than fifteen hundred dollars, and the jury found the value of the property to be fifteen hundred dollars. B. T. Gray, one of the plaintiffs, testified that he had charge of the team at the time the officer made the levy. The court, after quoting the provisions of the statute in reference to the sales of personal property in this State, instructed the jury as follows: "You are instructed that under this statute want of an immediate delivery and an actual and continued change of possession, in case of the sale from Davidson and Lockwood to plaintiffs, is conclusive evidence of fraud as against their creditors, and it makes no difference, as far as that question is concerned, whether such creditors had notice of an attempted sale or not, but an actual delivery and an actual and continued change of possession before the levy of the attachment is sufficient.

"If you believe from the evidence that the plaintiffs in good faith, without fraudulent intent, and for a valuable consideration, purchased the property sued for from Davidson and Lockwood, and took actual and immediate possession of the same, and were in the actual possession thereof at the time of the levy of the attachment, then you must find for the plaintiffs.

"If you believe from the evidence that  *  * · *   there was no actual and continued change of possession of the

property from Davidson and Lockwood to plaintiffs, you must find for the defendants.

"If you believe from the evidence that the witness William Meadows was in possession of the property sued for, in the capacity of a hired man for Davidson and Lockwood prior to the sale to plaintiffs, and that after such sale Meadows still kept possession of said property, and was in possession of the same at the time of the levy of the attachment, then such possession was conclusive evidence of fraud as against creditors, and there was no such change of possession as required by law.

"If you believe from the evidence that Meadows was not in the possession of the property at the time of said levy, but that B. T. Gray, one of the plaintiffs, had the actual possession thereof at that time, then there was such a change of possession as required by law.

"In order to show possession of personal property, the control and management of such property, or acts of ownership over it by the person claiming ownership of the same, can be taken into consideration by you; and if Meadows was acting in the same manner in reference to the property at the time of the levy, as he had prior to the sale to the plaintiffs, then there was no change of possession under the law."

At the request of defendants' counsel the court gave the following instruction: "The jury are instructed that in order to make a sale of property *bona fide* and good as against attaching creditors, there must be an actual and continued change in the possession of the property, such as would notify the world of the change in ownership and of the claims of the new owner; and if you find from the evidence in this case that there was not such a change in the possession of the property here in dispute, your verdict will be for the defendants."

The jury found a verdict for the plaintiffs.

Defendants moved for a new trial, which was refused.

Defendants appeal.

The other facts material to the decision are stated in the opinion of the Court.

*George W. Baker*, for Appellants.

The only question relied on by defendants in this case is that of constructive fraud in the change of the possession from Lockwood and Davidson to plaintiffs. Plaintiffs purchased the team upon January 1, 1875, for a fair consideration, and took immediate possession and changed the stable for the team. What constitutes constructive fraud in the sale of a chattel? The earlier cases in California were a little modified by the decisions in the case of *Stephens* v. *Irwin* (15 Cal. 503), which lays down the rule, which is sound in principle, and has ever since been adhered to and acquiesced in by that court.

The rule therein announced has been affirmed in the cases of *Engles* v. *Marshall*, 19 Cal. 329; *Godchaux* v. *Mulford*, 26 Cal. 323; *Woods* v. *Bugby*, 29 Cal. 472, and *Waldie* v. *Doll*, Id. 560, and may safely be said to be the settled law upon the subject, both in this State and California.

To the same effect, see 47 Cal. 612; 4 Nev. 367, and 1 Nev. 218.

Now, let us apply this principle to the facts of this case, as above stated. Was plaintiff's possession an open one? True, he took the possession of the team in the street, but the next morning William Meadows, the driver of Lockwood and Davidson, hitched it up and started out with it to the ranch on time, making regular trips.

The possession of plaintiff was not notorious. There was nothing connected with it that was calculated to notify third persons of the different relations of the property, or of the claims of the new owner to it.

Plaintiff's possession was not unequivocal. I take the term unequivocal, as used by the courts in this connection, to mean that the possession must be such as to be free from doubt as to who actually had the possession; and, if correct upon that point, then the plaintiff did not have such possession at the time of the levy.

*Thomas Wren,* also for Appellants.

I. It is clear upon the evidence that there was an actual change of possession at the time the sale was made, and that it continued for one night. Did it continue any longer?

Upon the next morning after respondents took possession of the property, Gray (one of the respondents) employed William Meadows, who was driving the team for Lockwood and Davidson at the time of the sale, to drive the team out to Lockwood and Davidson's ranch, to get some coal-sacks. This, in the eye of the law, was equivalent to a surrender of the possession of the team back to Lockwood and Davidson. The law requires that there shall be an actual and continuous change of possession of personal property upon a sale that will "give notice to the world that a transfer of possession has taken place." (*Doak* v. *Brubaker*, 1 Nev. 222.) This case is nearly analogous to that of *Hurlburt* v. *Bogardus* (10 Cal. 518).

Upon the sale of personal property, the law requires the purchaser to take actual possession of the property purchased, and to hold possession continuously. The authorities say that the possession must be open, notorious, actual and unequivocal, so as to notify strangers and third persons that there has been a change of ownership—that it must be taken not to be surrendered back, etc.

Is it not clear that Gray was not only not exercising any equivocal acts of ownership, or any act of ownership, over the team at the time it was taken, but that he had not, from the time he intrusted Meadows with it, up to the time of the levy, exercised a single act of ownership whatever to notify third persons that there had been a change of ownership, and that all his acts taken together were not at all calculated to give notice to third parties that there had been a change?

*Hillhouse & Davenport,* for Respondents.

I. The only question to be determined on this appeal is, Was there any evidence to justify the verdict? If there is

any evidence to justify the verdict, the appellate court will not interfere with the action of the lower court. (*Treadway* v. *Wilder*, 9 Nev. 70.) The evidence is all in the transcript, and the question now urged by appellant was fairly and properly submitted to the jury and decided by the verdict, which verdict was affirmed by the district judge in over-ruling the motion for a new trial. No motion was made for judgment for defendants after the testimony was in. If there was any evidence to go to the jury, then, of course, under the law the verdict will not be disturbed.

II. The statute of frauds, which appellants invoke here, has been a source of a great diversity of opinion with the bench and bar for years past. The courts for a time in California were very much inclined to, and did in fact give to this statute a very rigid and strict construction, and held that immediate delivery must have been made independent of the time when creditors' rights intervened, and that continuous change must have been forever, under all circumstances. This very strict construction was followed but a short time. The courts found that instead of promoting honesty and fair-dealing, such construction frequently declared transactions which were perfectly honest, fraudulent. In fact, the legislature never intended such rigid construction. It only adopted the stricter rule as laid down by the Supreme Court of the United States; and the courts of California, before our State was formed, modified those harsh and unjust rules formerly adopted in that State. Then, we submit, that in this case there was ample testimony to go to the jury. We are unable to find in any case any decision that holds that the employment of the employee of the vendor by the vendee is any more than a circumstance to go to the jury upon the question of actual fraud, unless, perhaps, where such employee continues in the same position, and had exclusive control of the property sold.

Meadows, it is true, drove the team out to the ranch, but Gray was with the team when the officer attached it; had control of it, helped to turn it, and was helping to load it. Plaintiff had contracted with E. Davidson (not one of the

firm of Lockwood and Davidson) to haul the coal. Lockwood and Davidson had sold the ranch to E. Davidson, and put him in possession of it; and at that ranch the officer levied upon the team while Gray, one of the plaintiffs, was present, in charge and assisting to load.

We submit, then, that upon a careful consideration of all the evidence, this Court will find that the evidence shows, not only enough to go to a jury, but enough to satisfy even the most strict and rigid construction ever invoked by a court on this question.

We refer to the following cases: *Clute* v. *Steele*, 6 Nev. 335, and authorities there cited; 26 Cal. 316–317, and cases there referred to.

By the Court, HAWLEY, C. J.:

It is claimed by appellants that there was not sufficient evidence, upon the trial of this case, to show such an actual and continued change of possession of personal property as the law requires in order to take the case out of the operation of the statute of frauds.

The property, consisting of a team of ten animals and three wagons, with harness, etc., was purchased by respondents of Lockwood and Davidson, on the first day of January, A. D. 1875, for a fair consideration. At the time of the purchase the team was hitched up and was standing in front of the Idaho Stable. Lockwood and Davidson, after executing a bill of sale of the team, delivered the possession of it to B. T. Gray, one of the respondents, who drove it over to Shipley's corral, and there unhitched and unharnessed it, assisted by a young man named McCall. The next morning Gray employed one William Meadows, who had been the teamster for Lockwood and Davidson, to drive the team to the Lockwood and Davidson ranch for some coal-sacks that he had also purchased with the team. Gray states, as a reason for the employment of Meadows, that he had ascertained the night before that McCall did not know the way to the ranch, and not knowing the way

himself he employed Meadows to go along, drive the team, and show him the road. About one hour after Meadows left Eureka with the team, Gray started on horseback, and when he had caught up with the team rode with the teamster on the wagon for some distance, then left him and rode on horseback to the ranch. The next morning he assisted the driver in harnessing and hitching up the team, and during the day Meadows drove the team, as directed by Gray, and while Gray was engaged in sewing sacks and other parties were filling them and loading the wagons, the officer came and attached the team as the property of Lockwood and Davidson, in a suit brought against them by Reilly and Harrison, attaching creditors.

From this brief statement of the evidence offered by respondents, it will be seen that the facts of this case are not, as. is claimed by appellants, analogous to *Hurlburt* v. *Bogardus*, for there the property, as stated in the opinion of the court, "remained in charge of the same person, at the same place, and was used in the same manner after as before such purchase." (10 Cal. 518.) Nor similar to the case of *Doak* v. *Brubaker*, where "the cattle were left where they were before the execution of the mortgage, and under the control and charge of the same herdsman." (1 Nev. 222.) Here actual possession was taken by the vendee. It was open and unequivocal, substantial and continuous, and was not taken to be surrendered back, if the testimony of respondents was true. The mere fact that Gray rode on the wagon is, as was argued by counsel, of but little significance. It was not, of itself, such an act as was calculated to give notice to third persons; so the mere fact of assisting to turn the wagon around the next day, or assisting in the loading of the wagon, were, of themselves, of but little importance. But all the facts and circumstances from the time of the purchase must be considered in the order and manner in which they occurred, and when this is done it does appear that Gray exercised such acts of ownership as is usual for persons who own that species of property. Independent of the reasons assigned by Gray for the em-

ployment of Meadows, we think his own acts tended to give notice to the world that he was the owner of the property. It was at all times, after the purchase, under his direction and control, and was never in the possession of either of the vendors; in fact, it was shown that they, being in failing circumstances, had fled the country prior to the levy of the attachment. The facts of this case bring it within the rule announced in *Stevens* v. *Irwin,* 15 Cal. 504, which was followed by this Court in *Carpenter* v. *Clark,* 2 Nev. 244. See also *Ford* v. *Chambers,* 28 Cal. 13; *Clute* v. *Steele,* 6 Nev. 335. The instructions and charge given by the court to the jury, against which appellants make no objection, were as favorable to appellants as the law would warrant. It is well settled that the employment of the vendor in a subordinate capacity is only colorable and not conclusive evidence of fraud. (*Godchaux* v. *Mulford,* 26 Cal. 324; *Billingsly* v. *White,* 59 Penn. State, 466.) Certainly no stronger rule ought to be adopted against the employment of the mere servant of the vendor. The court, in *Godchaux* v. *Mulford,* discussing the question of the employment of the vendor, said: "It was competent for the defendants to prove the fact as tending to show that there had been no actual and continued change of possession; but when proved it did not become conclusive of that question, * * * but only an element of proof to be weighed by the jury."

We think there was sufficient testimony in this case to preclude the court from declaring the sale fraudulent in law, and the jury to whom the question was fairly submitted, and whose province it was to decide, found that it was not fraudulent in fact. Upon a review of the whole case we are of the opinion that the rulings of the court were correct.

The judgment and order appealed from are affirmed.

BEATTY, J., dissenting:

I feel obliged to dissent from the opinion and judgment of the Court in this case, and in order to explain the grounds

of my dissent, find it necessary to give a fuller and more particular account of the facts proved on the trial.

It is to be borne in mind in this connection that the burden of proof was on the plaintiffs to show that the sale was accompanied by an immediate delivery and followed by an actual and continued change in the possession of the things sold; and it is further to be observed that all the circumstances attending this sale and going to show a change of possession were within the knowledge of B. T. Gray, one of the plaintiffs, upon whose testimony their whole case rests. Testifying in his own behalf, it is to be presumed that he told every material circumstance and represented it as favorably to himself as the truth would warrant. It is, therefore, not only true as a general proposition, but especially true in this case, that we are bound to presume that there was no circumstance at all calculated to manifest a change in the possession of this property beside those he has told us, and as to them that they were no more significant than he has described them. Tested by these principles of interpretation what does the case of plaintiffs amount to?

It appears that the vendors of the property in controversy—Lockwood and William Davidson—had been residing for a period of more than eight months prior to the sale on a ranch in the neighborhood of Eureka, engaged in the business of manufacturing and selling charcoal. Living with them and in their employ were E. Davidson, brother of William, and several other men. The mules, wagons and harness, which are the subject of this litigation, were used in hauling charcoal from the ranch to Eureka, and were in the immediate charge of William Meadows, as driver of the team, for some time prior to, and up to and including the day of the sale, January 1, 1875. What occurred on that day is stated in the opinion of the court. What occurred on the two following days and up to the time of the levy by the sheriff will be more particularly adverted to in the course of this opinion.

An actual change in the possession of the property was

undoubtedly shown, for Gray, assisted by his servant, un-hitched it and put it in a corral.  But that was as long as any change, outwardly manifested, continued, for during the night Gray discovered that his own teamster did not know the road to the coal ranch, to which he was obliged to send these teams (ten mules and three wagons) to get some coal-sacks included in his purchase, and he therefore rehired Meadows in the morning.  How early in the morning Meadows was again in charge of the property we are not told, but it must have been pretty early, for he left town by eight or nine o'clock, and, as it would have been a material circumstance in Gray's favor if he or any person other than Meadows, by his direction, had hitched up the teams that morning, we are bound to infer, from his silence on this point, that Meadows himself was found in charge of the property in his usual capacity the very first thing in the morning.  If such was the case there was nothing but a formal interruption to the employment of Meadows, and no change whatever in the employment of the teams.  They arrived in Eureka with a load of coal on the 1st of January, and the next morning, bright and early, they were on the road back to the same coal ranch, in charge of the same driver, and, so far as outward appearances would indicate, and as the event proved, on the usual errand.  True, they were kept in a corral in Eureka during the intervening night, but that would equally have happened if there had been no sale.  This Court may be allowed, I suppose, to know judicially that animals, as well as men, are usually permit-ted to rest at night.  Putting them in a corral, therefore, was no interruption to their employment.  And how long were they out of the hands of Meadows?  So far as the tes-timony shows, just long enough to be unhitched and cared for that night, for if he hitched them up as usual next morn-ing—as we must presume he did—and if it was not usual for him to sleep with them at night, which cannot be pre-sumed, then he was out of his usual ostensible relation to the property only while Gray and McCall were driving the teams to the corral and unhitching and putting them in,

which may perhaps have been an hour. To proceed with the statement: Meadows, again in full charge of the teams, proceeds as usual to the coal ranch. At a distance of ten miles from town he is overtaken by Gray on horseback, who hitches his horse to the wagon and rides on the wagon "some distance." He then remounts his horse and proceeds to Lockwood and Davidson's cabin, where he remains all night. Meadows camps with the teams by the water in the creek a half mile from the house. In the meantime, on this same day—January 2—Lockwood and William Davidson have been back to the ranch, turned everything over to E. Davidson, including some coal in the pits, and then fled the country. During the night of the 2d of January, Gray and E. Davidson make a contract for the hauling of Davidson's coal with Gray's (?) teams. On the morning of the .3d of January, Gray goes to the creek and "helps" Meadows hitch up the team. Meadows drives to the coal-pits. There Gray "helps" him turn the team, and gets on the wagons and throws off some coal-sacks, after which, with E. Davidson and other men who were in the employ of Lockwood and Davidson, he commences filling coal-sacks. At this point the sheriff appears and makes his levy. These are the whole facts of the case, and, in my opinion, they bring it fully within the principles of three or four of the cases in this State and California, the authority of which will not be questioned, in which the sale has been declared invalid as a legal conclusion from facts quite as strong, and in one case much stronger, in favor of the vendees.

In the opinion of the Court it is held that the cases of *Hurlburt* v. *Bogardus* (10 Cal. 518), and *Doak* v. *Brubaker* (1 Nev. 222), are not authorities in point, because, and only because, in those cases there was no actual change of possession to begin with, while in this case there clearly was. But I consider, notwithstanding this difference in the circumstances of those cases, that they are nevertheless very clearly and decisively in point. Two things must concur to give validity to a sale of personal property: there must be an actual change of possession, *and that actual change must*

*be continued.* Now if we know what, under any particular state of circumstances, is essential to be done in order to effect the actual change of possession required, we know equally well that the continuity of such actual change is at once destroyed if everything necessary to effect it is undone immediately afterwards. This proposition, it seems to me, cannot be denied, and applying it to this case, I say that if there could be no actual change in the possession of these mules and wagons without taking them out of the hands of Meadows as driver, or withdrawing them from their usual employment of hauling coal from the ranch of the vendors, then the very moment they were put back into the hands of Meadows as driver and put to their former use, the temporary change that had been effected was at an end; and if the duration of the change was insufficient in law the verdict in this case should have been set aside. Now it follows, as I think, clearly and undeniably from the two cases referred to, that it was necessary, in order to change the possession of this property, to take it out of the hands of Meadows or to put it to some different employment at some different place. One or the other, if not both of these things, was essential. I have shown that there was no interruption to the usual employment of the teams, and that substantially they were out of the hands of Meadows only for an hour, or at most, under any construction, for a night.

The case of *Hurlburt* v. *Bogardus* was identical with this, except that the driver of the team was discharged by the vendor and hired by the vendee on the spot, without being sent away for a night to be taken back in the morning, and except that the vendee did not ride a short distance with him next day, nor help him hitch up or turn his team the day following, nor help others to load his wagon. If I can show, by all the reason of the authorities, that these circumstances are of no significance, as I think I can, then that case is in point, and the language of the decision applies to this case. The court in their opinion say: "In this case there was no such actual and continued change in the possession of the property under plaintiffs' purchase as to take

the case out of the operation of the statute of frauds. It remained in charge of the same person, at the same place, and was used in the same manner after as before such purchase." The case of *Doak* v. *Brubaker* was essentially the same. There the property was cattle running at large upon a range and in charge of the vendor's herdsman. The herdsman was discharged by the vendor, employed on the spot by the vendee and continued in charge of the cattle. The facts were not the same as here, but analogous, and the principle upon which the case was decided embraces this case equally with that. It was held that the object of the act in question is to secure probity and fair dealing, and for that purpose to remove opportunities for fraud; and the court says: "In the case at bar no act was done which would indicate the intention of the parties or to give notice to the world that a transfer of possession had taken place. The cattle were kept where they were before the execution of the mortgage and under the control and charge of the same herdsman. Had there been a change in the herdsman, that would have been an act evidencing the change of property, and would probably have been sufficient to have effected a delivery." This quotation embodies a statement of the pervading, essential principle which has controlled the decision of all the cases in California and this State since *Hurlburt* v. *Bogardus* and *Stevens* v. *Irwin* (15 Cal. 503). It is this: To remove opportunities for fraud, the change of ownership must be advertised to the world by an open, manifest, unequivocal change in the possession of the property sold. This is what is said in *Stevens* v. *Irwin*—the leading case. It "must be open and unequivocal, carrying with it the usual marks and indications of ownership by the vendee. *It must be such as to give evidence to the world of the claims of the new owner.*" The last sentence, which I have italicized, contains the whole doctrine in a nutshell. The change must be so manifest as to give notice to the world of the claims of the new owner. Those who have been accustomed to see the property in its relations to the vendor before the sale, must be able to see in its situation or custody or employment after the sale un-

equivocal evidence of the ownership of the vendee, or at least a change of ownership from the vendor. If it has been in the immediate possession of the vendor he must relinquish the possession; if it has been in the hands of a servant of the vendor, that servant must be discharged or the property must be employed in some different manner or at some different place. And this change of *status* must continue long enough to impart general notice. How long it must continue is generally a question of fact, but if it has not lasted longer than one whole day it has been held as matter of law that that is insufficient (2 Wharton, Penn. 307; 6 Nev. 338–9), and I venture to say no case can be found holding the contrary.

Judged by the authority of *Stevens* v. *Irwin* alone, it seems to me the conclusions of the Court in this case are erroneous; but it happens that the very author of that opinion, while the court was constituted of the same members, had occasion to apply its principles to a case more nearly resembling this, but in all its circumstances immeasurably stronger in favor of the vendee. I allude to the case of *Engles* v. *Marshall*, 19 Cal. 320. In that case, at the close of the trial in the district court, the judge instructed the jury, in plain terms, to find a verdict for the defendants, because the evidence did not show a delivery and change of possession of the property sold. This instruction was, of course, erroneous, if there was any testimony in the case tending to show a change in the possession of the property actual and continued within the meaning of the law. (That there was an immediate delivery was not disputed.) The right of a party to have an issue of fact submitted to the jury is absolute when he has produced any evidence tending to establish it. His right to have the verdict sustained, which is the question here, is not absolute. Consequently if that instruction, taking the decision from the jury, was correct, it may be said *a fortiori* the court could not, in the exercise of a legal discretion, have refused to set aside a verdict for the plaintiff if the jury had been allowed to find one.

Let us see now what the plaintiff proved in that case. He proved that his brother, George Engles, and one Hamilton were partners, engaged in running a stage-line between Sacramento and Marysville; that they were equal owners of the business and stock, consisting of horses, harness, feed, and a stage. This stock was all kept on the road and at two intermediate stations. On the 26th of September William Engles purchased the interest of his brother George for a price more than double the value of his share of the movable property (the purchase including his share of the business). It was shown that before the sale George Engles, the vendor, managed the business of the firm, purchasing supplies, etc. After the sale Hamilton took his place, and was the active manager of the business for nearly three months, when it was discontinued. George Engles, in the meantime, had ceased to have any real or ostensible connection with it. On the day of the sale, George and William Engles went over the road together; all of the property was pointed out and delivered in the presence of the innkeepers at the two way-stations, the hostlers, and the driver of the stage; and they, as well as the agents of the line at Sacramento and Marysville, were notified of the change of proprietorship and retained in the service of the new firm of William Engles & Co. The waybills after the sale were headed William Engles & Co., instead of Engles & Co., as before, and all parties dealing with the firm were notified to make out their bills to William Engles & Co. At the time of the sale William Engles, who resided in Stockton, besides going over the road to receive a delivery of the property, spent two or three days in Sacramento, and his purchase was the subject of conversation in Ebner's Hotel. (Ebner was one of the attaching creditors.) There was no concealment nor attempt at concealment, but the driver, hostlers, and agents were not discharged, and the way-stations were not moved. Things remained in this posture until December 16, when the property was all removed from the road, divided, and put in a stable in Sacramento, Hamilton's on one side and William Engles's on

the other. That night it was seized at the suit of the creditors of George Engles.

These being the facts assumed to be true, Judge Baldwin says, Field concurring: "Upon examining the record in this case, we think the judge below did not err in instructing the jury that the facts showed no valid sale, for want of such change of possession of the property in controversy as is required by the statute of frauds. The property seems to have remained, to'all external appearances, in the same condition in which it was before the sale, with nothing to notify third persons of the sale or of the claims of the new owners." He then quotes the opinion in *Stevens* v. *Irwin*, and adds: "An application of these principles to the evidence shows that the case of the plaintiff is within the statute of frauds."

This shows what the authors of the decision which this Court assumes to follow, deemed to be the essence and pith of the doctrine in question, and the facts of that case show what they considered necessary to meet its requirements. I undertake to say that for every act done by Gray in this case to manifest to the world a change of ownership of the property in controversy, two acts were done in that case of more publicity and of greater significance. And let it be observed, particularly, that all that passed between the vendee and his servants, and the actual notice communicated to individual third parties, though they were more numerous in both classes in that case than in this, was held to be no notice to third persons—the meaning of the rule being that such notice can only be imparted by the changed *status* of the property as shown in its situation, or custody, or employment.

This Court, then, in basing its decision upon the authority of *Stevens* v. *Irwin*, must put a construction upon that opinion very different from that of its authors. "Here," this Court says, "actual possession was taken by the vendee," which I admit; but that "it was open and unequivocal, substantial and continuous," or anything but formal and temporary, I deny. That it "was not taken to be surren-

dered back" may be true, but this was equally true in all the cases referred to, and that shows that it proves nothing. In fact, it is only one of a number of essentials, and it is a complete *non sequitur* to say that because there can be no change when it is wanting, there must be a change when it is present.

What is said by the Court seems to imply that Gray's reasons for re-employing Meadows are something in his favor; but I submit that they have nothing to do with the question, If he changed the possession of the property openly and ostensibly, he needed no excuse; if he did not, nothing would excuse him. If excuses would serve, Engles and Hamilton had much more substantial ones. To have discharged all the employees about the business of a daily stage line, and moved the way-stations, must have occasioned very serious loss and inconvenience, and was a much more plausible excuse, moreover, than to say it was necessary to send a team of ten mules and three wagons twenty miles into the country for a few coal-sacks, and that no one but Meadows could find the way.

The Court admits that the acts done by Gray, after Meadows was put back in charge of the teams, were of little importance by themselves, as evincive of his claim of ownership, but argues that they have some factitious importance by reason of the order of their occurrence and their relation to the temporary displacement of Meadows. I think the Court might, with the sanction of the authorities, very safely have said that they were in themselves of no importance whatever. Is it an open and unequivocal act of ownership to ride for a short distance on a lonely road with the driver of a wagon, or to go to a lonely place and "help" to hitch up a team? Would any one who knew that Meadows had been driving those teams on that road, and in that employment for the vendors, have even conjectured that Gray was a purchaser of the property, if he had happened to see him taking that ride or helping to hitch up? But nobody did see him, and nobody knew of it, or had an opportunity to know of it, except Meadows, and

his knowledge passes for nothing. One thing, however, Gray did openly: he "helped" to turn the team at the coal-pits; which means, we may suppose, that at the request or by the direction of Meadows, he led the mules over some difficult ground. Did this imply that Meadows was his servant? I think rather the reverse. As to his helping to fill the coal-sacks and load the wagon, a number of other men were engaged with him in that work; and if it unequiv-ocally manifested his ownership of the teams, it equally manifested their ownership, which is absurd.

Now, how did these acts, of no importance in themselves, derive any importance from the order of their occurrence and their relation to a temporary change in the custody of the property with which they had no visible connection nor any connection whatever, except in the memory of Gray and Meadows? I confess that I cannot comprehend it. I can understand how a number of facts, each having some probative value, may, by aggregation, amount to satis-factory proof; but when in themselves they have no value whatever, I cannot understand how they can acquire an ag-gregate value by any amount of shuffling or combination. As to the other branch of the proposition, that some mys-terious influence emanated from the temporary discharge of Meadows—an act immediately undone—and imparted life and vigor to circumstances, otherwise meaningless, in the sight of the world, I can only regard that as a new and mistaken application of the text, "A little leaven leaveneth the whole mass."

But the Court further says of this property: "It was at all times, after the purchase, under his (Gray's) direction and control, and was never in the possession of either of the vendors." This is true, but the first part of the propo-sition is only true in the sense that his servant was using it according to directions privately communicated to him, and the whole proposition would have been equally true in *Engles* v. *Marshall*, or *Doak* v. *Brubaker*. And it might have been said in those cases, with equal truth, that the vendees "exercised such acts of ownership as is usual for

persons who own that species of property." Cattle owners usually leave their flocks in charge of hired herdsmen; and stage proprietors usually leave the driving of their stages and the grooming of their horses to drivers and hostlers. I have thus endeavored to show, from acknowledged authorities, that every single reason given by the Court for its decision is either unfounded or inconclusive, and have only to say, in taking leave of this branch of the case, that if the acts of Gray are, as now held, open and unequivocal evidences of dominion and ownership, it is very important that it should be known, and I am doing the public a service in calling particular attention to the rule of law; for it is not in this class of cases alone that it may be found applicable. Let us suppose, for instance, that John Doe is driving his own team along the public road, he is overtaken by Richard Roe on horseback, who hitches his horse to the wagon, and rides with John, not merely for a short distance, but all day, and camps with him at night in sight of Jack Stiles and other strangers. In their presence, Richard "helps" John unhitch his mules at night, and hitch them up in the morning; he helps him load up his camping outfit, and straighten out his team on the road. This is all Gray did, and a liberal allowance over. Let us suppose, at this point, that John steps into an inn for a moment to fortify himself with a morning dram, leaving Richard in charge of the team. While he is gone, Richard sells and delivers it to Jack Stiles, pockets the price, mounts his horse and puts out to Wisconsin on the track of Lockwood and Davidson. John Doe then reappears and claims his team, but Jack Stiles refuses to give it up. John sues and is met by a plea of estoppel. What can he reply? He has stood silently by and seen Richard Roe hold himself out to the world as his master and the owner of the team. If he has not been active in clothing him with all the *indicia* of ownership, he has at least kept silence when he ought to have spoken. Does not the rule apply that he who will not speak when he should, shall not speak when he would, to the injury of an innocent purchaser? If he does not lose by the same

rule upon which Gray prevails here, it is only because this is one of those rules that will not work both ways, and which, for that reason, are proverbially poor rules.

As to the case of *Godchaux* v. *Mulford*, cited by the Court, the only general deduction from that case applicable to this is, that a subsequent employment of the vendor of goods by the vendee, in the subordinate capacity of clerk or salesman, is not absolutely and under all circumstances incompatible with an actual and continued change of possession. All that was actually decided was, that under the peculiar circumstances of that case it might be left to the jury to say whether the change of possession was sufficiently manifested.    But this case is no more to be compared to that than darkness to light.   There the sale was of goods in a store, and a lease of the store.   Immediately after the execution of the papers, Kraft, the vendor, left the store and the town, and was absent three weeks; the door communicating with his dwelling was closed by nailing boards across it; his sign was taken down and replaced by that of Godchaux Brothers, the vendees, over the front of the store, and Godchaux and his clerks, strangers to the place, took entire charge.   At the expiration of three weeks, and after all these acts, so well calculated to manifest a change of ownership, Kraft was employed as a clerk in the store, but under Godchaux and along with another of his clerks, who both remained there and were present when the sheriff levied his attachment.   It certainly does not follow that because that was held to be a case for a jury, every case must be left to a jury; and *Engles* v. *Marshall* proves the contrary.   Moreover, it does not follow, as the Court infer, that if the vendor may be employed after the sale in a subordinate capacity, therefore and *a fortiori* his servant may be so employed.   If before the sale the vendor is in a position of authority and control, and after the sale is manifestly in a position of subordination to another, that of itself indicates a change in the *status* of the property; but if the servant's outward and ostensible relation to the property is exactly the same before and after the sale, there is noth-

ing to indicate such change. That case would have been like this if, instead of doing what he did, Godchaux had merely locked up the store at night and returned the key to Kraft in time to open it at the usual hour next morning, if he had then left Kraft in the apparently sole and exclusive possession, merely dropping in casually once or twice during the day and "helping" him to move a case or two of goods.

But if that had been the case, I venture to say the Court would not have left the question of change of possession to the jury. For what do the Court say? "He cannot be allowed to remain in the apparently sole and exclusive possession of the goods after the sale, for that would be inconsistent with such an open and notorious delivery and actual change as the statute exacts, in order to exclude from the transaction the idea of fraud. But if it be apparent to all the world that he has ceased to be the owner, and another has acquired and openly occupied that position; that he has ceased to be the principal in the charge and management of the concern and become only a subordinate or clerk, the reason of the rule announced in the statute is satisfied."

The case of *Clute* v. *Steele* has very little application to this case. It decides, for one thing, that a change of possession which lasts only one day is not a continued change, and so far is against the plaintiffs here. But it does not decide, nor even touch upon the point, what acts are necessary to evidence a change of possession. There was no question in that case that Clute had been in the open, notorious and exclusive possession of the property for at least one and perhaps two days before a suit was commenced or an attachment issued.

The case of *Ford* v. *Chambers* differs from this in many particulars, and especially in this fact, upon which the Court in their opinion lay particular stress, that the vendee took the actual and ostensible control of the store, selling goods to customers and giving orders to the clerks, who, the Court say, manifestly acted under his orders. But it differs in another most important particular. When the sheriff came

with his execution, Ford, 'the vendee, was in the store in a position of manifest authority and control, and he notified the sheriff that he was the owner of the goods, and forbade the levy. This brings to view the most pregnant circumstance in this case. Gray was present when the sheriff levied upon these goods. What more natural, if he was the *bona fide* owner, than that he should have said ·so then? What more unnatural than that he should have stood silent? Was it not to be expected that he would then have come forward and said: "This is not the property of Lockwood and Davidson; I purchased and paid for it two days ago. It is here in charge of my servant and in obedience to my directions?" But no. His lips were sealed; he was dumb. Not a murmur of protest escaped him. Having by his own culpable act, in keeping the appearance of the property unchanged, lulled the creditors of the vendors in false security long enough to give the vendors a fair start to Wisconsin with their ill-gotten gains, it might have been supposed that, when a word would perhaps have kept the creditors from incurring further loss and expense, he would have spoken it. But he did not; and having helped to defraud Reilley and Harrison of their debt he now asks that they be mulct in costs and damages. The whole case, from beginning to end, is a perfect illustration of the necessity of the law and the importance of enforcing it strictly. Construed as it has been in this case, it is reduced, in my opinion, to a state in which there will be none so poor to do it reverence; no capacity too mean and no artifice too shallow for evading it.

I think the judgment should be reversed.